## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ADDICKS SERVICES, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-06-3478 |
| | § | |
| GGP-BRIDGELAND, L.P. F/K/A ROUSE- | § | |
| HOUSTON, L.P., BRIDGELAND GP, LLC, | § | |
| AND SAFECO INSURANCE COMPANY OF | § | |
| AMERICA, | § | |
| *Defendants*. | § | |

## SUMMARY JUDGMENT OPINION

This construction contract dispute is before the court on defendant's partial motion

for summary judgment (Dkt. 61).[1]

## I.    Background

This case arises out of a July 20, 2004 contract between plaintiff Addicks Services

Inc. and GGP-Bridgeland f/k/a Rouse-Houston for Addicks to perform clearing, grading, and

excavating for the first phase of construction of a residential community known as

"Bridgeland."[2]  Addicks successfully bid $4,582,721.79 for the work, which involved nearly

2 million cubic yards of excavation and disposal, and approximately 532 acres of clearing

and grubbing.[3]  Although the work was to be completed in 150 days, the project was not

---

[1]     The parties have consented to the jurisdiction of the magistrate court for all purposes,
including final judgment (Dkt. 17).

[2]     The term "Bridgeland" in this Opinion collectively refers to defendants GGP-Bridgeland,
L.P. f/k/a Rouse-Houston, L.P. and its general partner, Bridgeland GP, LLC.

[3]     Addicks's Ex. A-35.

certified complete until November 25, 2005, more than 15 months after notice to proceed was given.[4]

According to Addicks, Bridgeland made major changes to the scope of work after construction began.  In addition, weather conditions caused delays.  Addicks alleges that Bridgeland has refused to compensate it for all of its additional expenses.  In February 2006, Addicks filed a mechanic's and materialman's lien in the amount of $2,257,394.97.  In October 2006, Addicks sued Bridgeland in Texas state court.[5] Addicks's operative pleading in this case seeks damages of $2,160,957.  The majority of Addicks's alleged damages, $1,970,352 are for lost productivity or delay costs.[6]

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The  party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable

---

[4]      Addicks's Second Amended Complaint, Dkt. 49, at 4.

[5]      Bridgeland has a counterclaim against Addicks for liquidated damages pursuant to Article 2.2 of the contract.  The counterclaim is not at issue on summary judgment. Addicks has also sued Safeco Insurance Company of America to recover on the Release of Lien Bond Safeco issued on behalf of Bridgeland in order to release Addicks's mechanic's and materialman's lien on the property.

[6]      Dkt. 49, at 5.

jury to find for the nonmoving party.  *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001).

"An issue is material if its resolution could affect the outcome of the action."  *Terrebonne*

*Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

A summary judgment movant who bears the burden of proof on a claim must establish

each element of the claim as a matter of law.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194

(5th Cir. 1986).  If the movant meets this burden, "the nonmovant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue for trial."

*Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex,*

*Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

If the evidence presented to rebut the summary judgment is not significantly probative,

summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

50 (1986).  In determining whether a genuine issue of material fact exists, the court views

the evidence and draws inferences in the light most favorable to the nonmoving party.  *Id.*

at 255.

## III.   Analysis

Bridgeland moves for partial summary judgment on all costs incurred by Addicks

through November 25, 2005.  Bridgeland contends that Addicks released these claims by

signing releases, styled "Waiver and Release of Lien Upon Progress Payment," every month

between August 2004 and November 2005.[7]  Each release states that in consideration for a

---

[7]      Bridgeland's  Exs. A-1 - A-15.

progress payment, Addicks "waives and releases its lien and right to claim a lien for labor, services, or materials furnished through" the date of the waiver.  By signing the release, Addicks acknowledged that "the payment referenced above, once received, constitutes full and complete payment for all work performed, and all costs or expenses incurred . . . relative to work or improvements at the Project as of the date of this Waiver."  Each release further states:[8]

> [T]he undersigned hereby specifically waives, quitclaims and releases any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have against the Owner , . . . or any other person with a legal or equitable interest in the Project, as of the date of this Waiver, except as follows: _____ _____

There is nothing written in the blank on any of the 15 releases.

Addicks alleges that Bridgeland would not allow Addicks to include extra-contractual work and delay costs in its monthly pay estimates.  According to Addicks, it was understood by the parties that the releases covered only work performed pursuant to the original contract, and that Addicks would be paid for supplemental work through a separate process.  Addicks asserts the following defenses to enforcement of the releases:  (1) ambiguity; (2) waiver; (3) estoppel; and (4) mutual mistake.[9]

---

[8]        *See, e.g.,* Bridgeland's Ex. A-1 at 1.

[9]        Bridgeland argues that Addicks cannot assert its affirmative defenses because it did not plead them.  The court has previously ruled that Addicks is not precluded from relying on its defenses because the pleading rules do not require a responsive pleading to affirmative defenses asserted in an answer.  *See* Dkt. 85.

1.      **The Releases Are Not Ambiguous.**

Deciding whether a contract is ambiguous is a question of law for the court.  The primary concern of the court is to ascertain the true intentions of the parties as expressed in the contract.  In doing this, the court examines the entire writing and tries to harmonize and give effect to every provision so that none will be rendered meaningless.  A contract is unambiguous if it can be given a definite or certain legal meaning.  On the other hand, if a contract is subject to two or more reasonable interpretations, after applying pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent.  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  Parol evidence is not admissible to render a contract ambiguous, but the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists.  *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex. 1998).

Addicks relies on the title of the document, "Waiver and Release Upon Progress Payment," in support of its interpretation that each release covers a claim only to the monthly progress payment itself.  But the phrase "release *upon* progress payment" is not the same as "release *of claim to* progress payment."  The use of the word "upon" in the title of the document reasonably refers to the timing of the release.  It is followed by the words "progress payment" to describe the consideration given in return for the release.  It is not reasonable to interpret the phrase "release upon progress payment" as a limit on the scope of the claims released.  To do so ignores the express language of the body of the release, a

5

result contrary to basic rules of contract construction.  Under Addicks's theory, the release would amount to nothing more than a receipt for payment.

Addicks relies heavily on *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384 (Tex. 1997).[10] In *Green*, a subcontractor, Solis, performed extra work on a prison construction project.  In return for periodic payments, Solis executed releases every 30 days agreeing to:

> [R]elease Contractor from all claims arising out of or by reason of work performed and materials furnished under said subject Subcontract and under the Contractor's prime contract with the Owner.

The question presented to the court was whether the non-specific "global" language of the releases barred Solis's recovery for extra-contractual work.  *Id.* at 388-89

The *Green* court looked to matters outside the language of the release to determine the actual intent of the parties.[11]  The court reasoned that because it was understood at the time Solis signed the releases that Solis would receive future payments for retention[12] as well as for change orders, the parties must have intended that Solis would not release "all claims" every 30 days, despite the language of the release to the contrary.

---

[10]   The primary question presented in *Green* was whether a "no-damages-for-delay" clause in the subcontract was enforceable.  The court determined it was.  This case does not involves a no-damages-for-delay clause, and the discussion in *Green* regarding exceptions to enforcement of such clauses is not relevant here.  951 S.W.3d at 387.

[11]   Without saying so expressly, the *Green* court apparently found that the releases contained latent ambiguities.  A latent ambiguity exists when a contract is unambiguous on its face but becomes ambiguous when read in light of a collateral matter.  If a latent ambiguity is present, parole evidence is admissible for the purpose of ascertaining the parties' true intent.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

[12]   Texas law (and the applicable subcontracts), required an owner to retain ten percent of each periodic payment due.  *Green*, 951 S.W.3d at 389.

6

The language of the releases at issue in this case is materially different. Rather than a generic reference to "all claims" as in *Green*, these releases expressly delineated which claims are excluded (*e.g.,* "payment for retainage"), and which claims are included (*e.g.,* "damages due to delay, hindrance, interference, acceleration, inefficiencies, or extra work"). Unlike *Green*, these releases specifically waive the very sort of claim for which recovery is sought, in language too plain to be ignored or swept aside.

The court concludes that the releases are not ambiguous as a matter of law. Parole evidence is therefore inadmissible to determine their meaning. Addicks cannot avoid partial summary judgment based on its ambiguity defense.

### 2.    Bridgeland's Conduct Did Not Waive its Right to Enforce the Releases

A "waiver" is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Addicks argues that Bridgeland's conduct in paying for certain extra-contractual work after Addicks executed releases is inconsistent with enforcement of those releases.

Each month from August 2004 through November 2005, Addicks submitted to Bridgeland a bill for work performed pursuant to the contract during the preceding month, as well as work covered by approved change orders.[13] Often, Addicks performed work at

---

[13]    Bridgeland's Exs. A-1 - A-15. Each monthly pay estimate was paid in full by Bridgeland except for the period ending August 25, 2005, where Bridgeland paid only $126,285.50 of Addicks's $287,845.80 pay estimate. *See* Bridgeland's Ex. B-2 (Addicks's Admissions). However, Addicks signed another release on September 25, 2005 and did not except its claim

Bridgeland's request before a written change order issued.  Therefore, there are instances where work was actually performed during a month prior to the one in which it was billed.

For example, between October and December 2004, Addicks performed extra-contractual work to "undercut at fill site."  Addicks sought $27,195.60 in additional costs for this work.  Bridgeland paid this amount on August 24, 2005 under change order 13. Bridgeland paid the $27,195.60 despite the fact that Addicks had signed numerous releases between October 2004 and August 2005.  Similarly, Bridgeland paid Addicks $526,539.00 in October 2005 for costs incurred between April and October 2005 for additional haul distance for soil disposal, despite the fact that Addicks has signed numerous releases between April and October 2005.[14]  However, it is undisputed that these payments were followed by further releases signed by Addicks.  In this way, the contract and releases were serially modified in writing by the parties.  Bridgeland has made no payments after the last release was signed on November 25, 2005.

Under the circumstances, Bridgeland's conduct is not inconsistent with enforcement of the releases.  Bridgeland may have paid claims that were previously released, but only

---

for the unpaid portion of its August 25, 2005 pay estimate from that release.  The court cannot tell whether the unpaid $161,560.30 from the August 25, 2005 pay estimate comprises any portion of the damages Addicks seeks in this case.

[14]   *See* Bridgeland's Exs. A-14 - A-15.  It is unclear why Bridgeland approved and paid change order 14 in the total amount of $690,933.87 after having approved it only in the amount of $164,394.53 on October 3, 2005.  *See* Addicks's Ex. A-17.  But the fact that it did so is of no legal significance here.

upon securing another release.  This conduct actually weighs against finding an intentional waiver by Bridgeland.

Again, the *Green* case, relied upon by Addicks, is materially different from this one. The *Green* court based its ruling in part on the fact that the subcontracts at issue contemplated change orders would be issued, and in fact Green approved change orders for extra work several months after Solis signed the *last* release.  951 S.W.2d at 389.  The court held that the written change orders modified the subcontracts, *not* that Green had waived the release by its conduct.[15]  In other words, the releases simply did not cover the claims Solis was making, as a matter of contract interpretation.  Here, the court has already ruled that the language of the releases unambiguously applies to the claims Addicks is making in this case. *Green* does not support Addicks's waiver defense to enforcement of the releases.

### 3.    Bridgeland is Not Estopped From Relying on the Releases.

Promissory estoppel is an equitable doctrine.  To establish it, Addicks must show:  (1) that Bridgeland made a promise; (2) Bridgeland could foresee that Addicks would rely on the promise; (3) Addicks relied on the promise to its detriment.  *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983).  The doctrine of promissory estoppel requires more than vague

---

[15]    The parties dispute whether the court's ruling in *Green*, was that Solis did not release claims for extra work for which change orders were issued after Solis signed a release, or did not release all claims for extra work, even where no change order ever issued.  The court reads the plain language of the opinion as limiting the *Green* court's ruling to payment for change orders issued after Solis's last release was signed.  *Id.* at 389.  Addicks relies primarily on the parties' briefing, as opposed to the decision itself, to support its position.  However, the court's analysis does not require a definitive ruling on this point.

and indefinite assurances: "the doctrine does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 570 (Tex. App. – Dallas 1989, no writ) (citing *Wheeler v. White*, 398 S.W.2d 93, 95 (Tex. 1965)).[16]

The evidence cited by Addicks establishes nothing more than the existence of an ongoing dispute regarding Addicks's right to additional payments.   Addicks submits transcripts of telephone voice-mail messages from Bridgeland's Patsy Morris to Addicks's Nelson Barfield between August and November 2005.[17]   In each message, Morris stated some variation on the theme that Bridgeland was trying to resolve the payment dispute.   In a message on August 19, Morris stated "if we can't resolve it then I need to stop everything and I need to get someone else in here to get this fill into the information center and the berm."   In another, she states "nothing is resolved it's not going to be resolved until you and Brown and Gay . . . agree on the quantities" and "we'll get you something for this dirt that you're moving."   Morris's statements hardly constitute a promise to pay any specific claim.

---

[16]     Addicks also asserts the doctrine of quasi-estoppel, which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *Eckland Consultants, Inc. v. Ryder, Stillwell Inc.*, 176 S.W.3d 80, 87 (Tex. App. – Houston [1st Dist.] 2004, no pet.).   Unlike promissory estoppel, quasi-estoppel does not require misrepresentation or detrimental reliance.   *Id.*   Because the court has already ruled that Bridgeland's conduct in making certain payments after Addicks had signed a release is not inconsistent with enforcement  of the releases, Addicks's quasi-estoppel defense also fails as a matter of law.

[17]     Addicks's Ex. A-36.

Indeed, the record is clear that Addicks never even submitted a claim specifying an amount for delay and disruption costs until after this lawsuit was filed.

Furthermore, any reliance by Addicks on Morris's statements was unjustified. Addicks is not an unsophisticated consumer, but an experienced participant in the construction industry.[18]  The fact that Bridgeland paid some claims in exchange for a further release is not reasonable grounds to assume that Bridgeland would pay any and all future claims.

In its briefs, Addicks seems to imply that it went out and performed millions of dollars worth of extra work at the job site based on Bridgeland's implicit promise to pay for that extra work.  But only a small portion of the over $2 million in damages Addicks seeks in this case is actually for extra work items.[19]  The rest is delay costs calculated after the project ended.  Addicks did not go out and incur delay costs in reliance on any promise by Bridgeland to reimburse Addicks for its lost productivity.  Addicks cannot avoid summary judgment based on promissory estoppel.

### 4.    The Parties Did Not Make a Mutual Mistake

---

[18]    Barfield has a degree in civil engineering and has worked in the earth moving business for 33 years.  Barfield Affidavit, ¶ 2.

[19]    In addition to loss of productivity damages, Addicks seeks $26,061 for added scope of work, $142,788 for the cost of escalated fuel prices, and $21,756 for "general conditions." Second Amended Complaint, at 5.  Thus, Addicks is actually seeking only minimal damages for extra work.

11

When parties make a contract under a misconception or ignorance of a material fact, the agreement may be reformed to give effect the parties' intention.

> The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent, which would necessitate trial to a jury in all such cases, but rather solely by objective circumstances surrounding execution of the release, such as the knowledge of the parties at the time of signing concerning the injury, the amount of consideration paid, the extent of negotiations and discussions as to personal injuries, and the haste or lack thereof in obtaining the release.
>
> *        *        *
>
> When mutual mistake is alleged, the task of the court is not to interpret the language contained in the release, but to determine whether or not the release itself is valid.

*Williams v. Glash*, 789 S.W.2d 261, 264-65 (Tex. 1990).  The parol evidence rule does not bar extrinsic proof of mutual mistake.  *Id.* at 264.  "Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake."  *Davis v. Grammar*, 750 S.W.2d 766, 768 (Tex. 1988).[20]

There is no objective evidence in this case that the parties were operating under a mutual mistake as to the meaning of the releases.[21]  Addicks argues that Patsy Morris, who

---

[20]     The majority of cases discussing unilateral mistake, including *Davis*, involve deed reformation.  However, the court has found no authority expressly limiting the doctrine to such cases.

[21]     Bridgeland submits the deposition of George Joiner in support of its contention that Addicks understood the releases.  Joiner testified that he reviewed the form release at the time Addicks was awarded the job, that such releases were pretty standard, and that he understood that in return for payment Addicks would release all claims other than those expressly excepted.  Bridgeland Ex. B-5.  Addicks moves to strike this summary judgment evidence because Joiner was not involved in the project after August 2004 and has no personal

was responsible for overseeing Addicks's monthly pay estimates, believed that the releases only released claims for contract items on the official pay estimates.[22]  Addicks cites Patsy Morris's deposition testimony in support of this argument:

> Q.     . . . so as the contractor got paid a certain amount under the contract, they would sign this lien release releasing claims to the amounts being paid, correct?
>
> A.     Yes.[23]

The testimony cited above does not prove nearly as much as Addicks contends.  First, Morris testified in response to immediately preceding questions that the lien releases are always signed in the offices of Brown & Gay, the project engineers, and only came to her later.  She "did not pay a lot of attention to them."[24]  Second, it is undisputed that the releases

---

knowledge of the actual signed releases.  The court overrules Addicks's objection and denies the motion to strike (Dkt. 66).  However, the court does not agree with Bridgeland that Joiner's testimony "conclusively negates" Addicks's mistake defense.  There is no evidence that Joiner shared his understanding with Barfield, who signed the most significant release, the last one signed on November 25, 2005.  In any event, the court's decision does not depend on the testimony of Joiner.

[22]   Addicks submits the affidavit of Nelson Barfield as to Bridgeland's intention.  Bridgeland moves to strike Barfield's affidavit (Dkt. 68).  Barfield's testimony as to what Bridgeland and/or Patsy Morris thought or understood the releases to mean is speculative and lacks foundation.  Bridgeland's objection to such testimony is sustained.  Bridgeland's relevancy and hearsay objections are overruled.  Bridgeland's motion to strike (Dkt. 68) is granted in part and denied in part.  However, even to the extent admissible Barfield's affidavit does not create a genuine issue of material fact as to any claim at issue in Bridgeland's motion for partial summary judgment.

[23]   Addicks's Ex. D, at 254.

[24]   *Id.*

13

cover claims to the amounts being paid.  The issue is whether the releases also cover "all work performed . . . as of the date of this Waiver," as its language clearly states.  Morris did not testify as to that aspect of the releases.

Addicks also asserts without competent evidentiary support that Bridgeland would not have paid separate invoices for extra work not included in the monthly pay estimates if it had thought that claims for those extra work items had been released.  But, Bridgeland may well have made a business decision to do so, protecting itself against additional claims by securing a new release every month.  Therefore, Bridgeland's payment for some extra work items claimed by Addicks is not evidence of its mistake as to the meaning of the releases.

Addicks cannot avoid the plain language of a contract simply by claiming it misunderstood its meaning.  The self-serving, subjective statements in Barfield's affidavit are not objective evidence of mistake.  "The mutual mistake doctrine is not available simply to avoid the results of an unhappy bargain.  Parties should be able to rely on the finality of freely bargained agreements."  *Wallerstein v. Spirt*, 8 S.W.3d 774, 781 (Tex. App. – Austin 1999, no pet.).

It is true that Addicks continued to submit requests to Bridgeland for additional payments after signing each release.  It is also true that Bridgeland agreed to pay some of those requests.  However, it is not reasonable to equate Bridgeland's knowledge of Addicks's supplemental invoices and pay requests with knowledge that Addicks did not understand the plain language of the releases.  Given the unambiguous language of the releases and

Addicks' failure to take advantage of the opportunity presented by the blank space on the releases to identify disputed costs, the equities simply do not weigh in favor of reforming the releases to allow Addicks to recover expenses incurred prior to November 25, 2005.

## IV.    Conclusion and Order

For the reasons discussed above, Bridgeland's motion for partial summary judgment (Dkt. 61) is granted.  Addicks's claims for damages incurred prior to November 25, 2005 are barred by release.

Signed at Houston, Texas on October 27, 2008.

Stephen Wm Smith
United States Magistrate Judge